IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 21, 2025 Session

# IN RE TONI S.

**Appeal from the Juvenile Court for Davidson County**
**No. PT274196      Sheila Calloway, Judge**

———————————————————

## No. M2024-00906-COA-R3-PT

———————————————————

This is a termination of parental rights case. The trial court determined that the Department of Children's Services failed to meet its burden of proof as to any of the statutory grounds set out in its petition to terminate appellee/mother's parental rights to the minor child. Although unnecessary in view of its determination that there were no grounds for termination, the trial court undertook a best interest analysis and found that it was not in the child's best interest to terminate mother's rights. Because the evidence does not support the trial court's findings as to either grounds or best interest, we reverse the trial court's order and remand for entry of an order terminating appellee/mother's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Reversed and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which CARMA DENNIS MCGEE and VALERIE L. SMITH, JJ., joined.

Jonathan Skrmetti, Attorney General and Reporter, J. Matthew Rice, Solicitor General, and Amber L. Barker, Senior Assistant Attorney General, for the appellant, Tennessee Department of Children's Services.

Ashley Preston, Franklin, Tennessee, for the appellee, Teia S.[1]

Thomas H. Miller, Franklin, Tennessee, guardian ad litem.[2]

## OPINION

## I. Background

---

[1] In cases involving minor children, it is the policy of this Court to redact the parties' names to protect their identities

[2] Mr. Miller filed an appellate brief in this case.

Toni S. (the "Child") was born in October 2021. The Child's mother is Appellee Teia S. ("Mother"). The Child's father is unknown. The Child is the youngest of Mother's four children; she does not have custody of any of them. At the hearing on the petition to terminate her parental rights, Mother testified that she has been addicted to cocaine for approximately eight years:

> Q. How long have you been a drug user []?
> A. I can't remember, probably like seven or eight years.
> Q. Seven or eight years. And what is your drug of choice?
> A. Cocaine.
>
> ***
>
> Q. Now, it would appear [] that you have a drug problem. Would you agree with That []?
> A. Clearly.

When Mother was approximately seven months pregnant with the Child, she tested positive for drugs and was referred to Next Door for treatment. Mother testified that Next Door "was an excellent program." Although Mother did not finish the program at Next Door, she stayed sober until the Child was born. Around the time the Child was born, Mother's boyfriend, Antonio K., was released from jail. Mother resumed her relationship with Antonio K. and starting using drugs again. As Mother testified, Antonio K. is a drug user as well:

> Q [to Mother]. Okay. So from whenever you left The Next Door a month or two before you gave birth to [the Child] until—I believe you testified that you got back with Antonio about a week or so before—
> A. No. I think he got out of jail, like, May the 1st of 2022. I think that's when he got out of jai1, and then I just started back [using drugs]. . . .
> Q. So he was using?
> A. Yeah, and I started back doing it too, like my mistake, you know.

The record shows that Mother has continued using illicit drugs since the Child was born. As discussed below, Mother has tested positive for (or admitted to using) cocaine, suboxone, and THC.

Giving rise to the instant case, on May 9, 2022, the Department of Children's Services ("DCS") received a referral alleging that, "A baby was left in [a] car seat in the middle of the parking lot next to a vehicle." DCS spoke with a police officer on scene, who reported that police found the Child in the care of Wilean H., Mother's neighbor, who brought the Child in from the parking lot. The police telephoned Mother and requested she come to Wilean H.'s house to get the Child. Mother refused and attempted to get the officer

to leave the Child with another neighbor; that neighbor stated that she "did not want to be involved."

DCS contacted Mother the next day, May 10, 2022. Mother refused a drug screen but, according to DCS' emergency petition, admitted the following: (1) "she last used alcohol and cocaine on May 8, 2022"; (2) "she does not have stable housing and bounces around a lot"; and (3) "she had been diagnosed with bi-polar disorder but does not use medication for it." Concerning the events that precipitated DCS' involvement, Mother explained that

> while she was at the neighbor's house, her paramour, Antonio K[.] came over to the home and told her to come back to get her baby. [Mother] stated that she and Mr. K[.] began fighting and her neighbor, Wilean, stated that she would watch the baby because she did not need to see that. [Mother] stated that she then got into an altercation with Mr. K[.] and a friend. [Mother] stated that she left after the altercation and went to Mr. K[.'s] mother's home. [Mother] stated that she returned later . . . to retrieve the baby, but the baby was no longer there. [Mother] stated that she believes the neighbor left the baby outside.

In her testimony, Mother explained that, when police arrived, she fled the scene of her altercation with Mr. K. and the "friend" and refused to return to get the Child because she had an outstanding warrant stemming from her failure to appear on a shoplifting charge and feared arrest.

On May 11, 2022, DCS filed a petition for emergency custody based on concerns of drug use, lack of supervision, and domestic violence. The Juvenile Court for Davidson County ("trial court") granted the emergency petition on the same day. The Child was placed in foster care, where she has remained since that time. Since coming into foster care, the Child has shown certain developmental delays around feeding and standing. She is currently receiving therapy for these issues.

On April 23, 2023, the trial court adjudicated the Child to be dependent and neglected based on Mother's stipulation to the grounds of "admitted substance abuse, unstable housing, and lack of supervision." Counsel was appointed for Mother, and a guardian ad litem was appointed for the Child.

Following the Child's removal to DCS custody, DCS developed a permanency plan on May 31, 2022. Tenn. Code Ann. §37-2-403. Following a hearing on June 14, 2022, the trial court ratified the plan, under which Mother had the following responsibilities: (1) complete a parenting assessment, a mental health assessment, and an alcohol and drug (A&D) assessment and follow all recommendations thereof; (2) submit to random drug screens; (3) maintain a legal source of employment and provide proof to DCS; (4) maintain

- 3 -

safe and stable housing and provide proof to DCS; (5) maintain contact with DCS and notify DCS of any changes of contact information; (6) refrain from any legal trouble; and (7) comply with four hours of supervised visits each month and notify DCS if unable to attend a visit.

On January 12, 2023, DCS filed a petition to terminate Mother's parental rights. DCS alleged five grounds for termination: (1) abandonment for failure to support; (2) substantial noncompliance with the permanency plan; (3) persistence of the conditions that led to the Child's removal; (4) severe child abuse; and (5) failure to manifest an ability and willingness to assume custody. At trial, DCS announced its intention not to pursue the ground of severe child abuse. On January 25, 2024, January 31, 2024, and February 12, 2023, the trial court heard DCS's petition and also heard Mother's motion, which was filed on December 5, 2023, requesting a finding that DCS failed to make reasonable efforts to assist her. On May 28, 2024, the trial court entered two orders. Concerning Mother's motion, the trial court entered an order finding that DCS failed to make reasonable efforts. Originally, this order was not included in the appellate record; however, the record has been supplemented. In the second Final Order, the trial court found that DCS failed to meet its burden as to any of the asserted grounds for termination of Mother's parental rights. Although the trial court found no grounds for termination, it proceeded to address the Child's best interest, finding that termination was not in the Child's best interest. DCS and the Child's guardian ad litem, Thomas H. Miller (together with DCS, "Appellants") appeal.

## II. Issues

Appellants raise the following issues for review:

I. Whether the trial court erred in holding that none of the alleged grounds to terminate Mother's parental rights were established by clear and convincing evidence.
II. Whether the trial court erred in holding that termination of Mother's parental rights was not in the Child's best interest.

## III. Standard of Review

It is well-settled that:

A parent's right to the care and custody of [his or] her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clause of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*,

- 4 -

855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors. . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also* *Santosky v. Kramer*, 455 U.S. 745 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d 507, 522-23 (Tenn. 2016) (footnote omitted).

Termination of parental rights proceedings are governed by statute in Tennessee, *In re Kaliyah S.*, 455 S.W.3d 533, 541 (Tenn. 2015), and the statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g))) (internal quotation marks omitted).

Tennessee Code Annotated section 36-1-113 governs the termination of parental rights. It provides, in pertinent part:

(c) Termination of parental or guardianship rights must be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

Tenn. Code Ann. § 36-1-113(c). Therefore, every termination of parental rights case requires the trial court "to determine whether the parent has engaged in a course of action or inaction that constitutes one of the statutory grounds for termination[,]" and whether termination of the parent's rights is in the child's best interest. *In re Donna E.W.*, No. M2013-02856-COA-R3-PT, 2014 WL 2918107, at *2 (Tenn. Ct. App. June 24, 2014). "Because the stakes are so profoundly high[ ]" in a termination of parental rights case, the statute "requires persons seeking to terminate a . . . parent's parental rights to prove the statutory grounds for termination by clear and convincing evidence." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). This Court has observed that "[t]his heightened burden of proof minimizes the risk of erroneous decisions." *Id.* (citations omitted).

If the trial court determines that clear and convincing evidence supports grounds for

termination in light of its factual findings, the court "should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d at 555. The party petitioning for the termination of parental rights bears the burden of demonstrating that termination is in the best interest of the child by clear and convincing evidence. *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010).

We review the trial court's findings of fact *de novo* on the record with a presumption of correctness. Tenn. R. App. P. 3; *In re Carrington H.*, 483 S.W.3d at 524 (citations omitted). However, "[i]n light of the heightened burden of proof in termination proceedings . . . [we] must make [our] own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524 (citation omitted). A trial court's conclusion that clear and convincing evidence supports termination of parental rights is a conclusion of law that we review *de novo* with no presumption of correctness. *In re Carrington H.*, 483 S.W.3d at 524 (citation omitted). "This standard of review is consistent with the standard of review for mixed questions of law and fact." *In re Taylor B.W.*, 397 S.W.3d at 112-113 (citing *Starr v. Hill*, 353 S.W.3d 478, 481-82 (Tenn. 2011) ("Although a presumption of correctness attaches to the trial court's findings of fact, we are not bound by the trial court's determination of the legal effect of its factual findings[.]").

## IV. Analysis

DCS sought termination of Mother's parental rights on the grounds of: (1) abandonment by failure to support pursuant to Tennessee Code Annotated section 36-1-113(g)(1), as defined by Tennessee Code Annotated section 36-1-102(1)(A)(l)(a); (2) substantial noncompliance with the requirements of the permanency plan pursuant to Tennessee Code Annotated section 36-1-113(g)(2); (3) persistence of the conditions that led to the Child's removal from Mother's custody pursuant to Tennessee Code Annotated section 36-1-113(g)(3); and (4) failure to manifest an ability and willingness to assume legal and physical custody of the Child pursuant to Tennessee Code Annotated section 36-1-113(g)(14). If we conclude that the trial court erred in finding that DCS failed to meet its burden of proof as to at least one of the grounds for termination of Mother's parental rights, then we will proceed to review the trial court's findings concerning the Child's best interest. We begin with the grounds for termination.

## A. Abandonment by Failure to Support

Tennessee Code Annotated section 36-1-102(1)(A)(i)(a) defines the ground of abandonment as follows:

(i) For a period of four (4) consecutive months immediately preceding the

filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to . . . support or have failed to make reasonable payments toward the support of the child[.]

Here, DCS filed its petition to terminate Mother's parental rights on January 13, 2023, so the four-month period is September 12, 2022, to January 12, 2023.

Tennessee Code Annotated section 36-1-102(1)(D) provides that, as used in the section 36-1-102(1)(A)(i)(a), "failed to support" or "failed to make reasonable payments toward such child's support" means

the failure, for a period of four (4) consecutive months, to provide monetary support or the failure to provide more than token payments toward the support of the child. That the parent had only the means or ability to make small payments is not a defense to failure to support if no payments were made during the relevant four-month period.

Tenn. Code Ann. § 36-1-102(1)(D). "For purposes of this subdivision (1), 'token support' means that the support, under the circumstances of the individual case, is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B).

In its final order, the trial court made the following findings on this ground: Mother testified she has bought clothes and various items for the child when visiting with her, but never paid any monetary support. There is no order on record setting the amount of support that Mother should have paid nor any information informing Mother of how and when support payments should be made. There was no [evidence] that Mother had the ability to pay support. There is evidence to show that Mother has provided more than a token of support for the child through the things she provided during her visits. Therefore, there are not grounds for termination for failure to support.

As an initial matter, there are two statements in the trial court's order that appear to misconstrue the current law. First, the trial court states that "[t]here is no order . . . setting . . . support." The fact that there is no order requiring Mother to pay support is not dispositive of this ground. Under Tennessee Code Annotated section 36-1-102(H), "[e]very parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children[.]"); *Kirkpatrick v. O'Neal*, 197 S.W.3d 674, 680 (Tenn. 2006) (holding "that a parent is liable for the support of his or her child throughout minority, with or without the existence of a court order, and that parents are liable for support retroactively from the date custody is granted to another

person."). In short, the absence of a support order does not relieve Mother of her responsibility to support this Child. Accordingly, to the extent the trial court's decision rests on the absence of such order, this was error.

Furthermore, the trial court's statement that, "There was no finding that Mother had the ability to pay," appears to misstate the burden of proof applicable to the question of whether a parent's failure to support is willful. Under Tennessee Code Annotated section 36-1-102(1)(I), as amended in 2018:

> The parent . . . shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure[.]

Contrary to the trial court's order, *supra*, a finding that Mother had the ability to pay support is unnecessary; the law presumes that she does. In the face of this presumption, it was Mother's burden to show that she did not have the ability to pay support. Before turning to review the question of whether Mother met this burden, we recall that the absence of willfulness "is an affirmative defense," which must be raised in the responsive pleading pursuant to Tennessee Rule of Civil Procedure 8.03. Here, Mother's initial response to DCS' petition is not contained in the appellate record, nor does the final order reference any response or affirmative defense that might have been raised therein. As such, we cannot ascertain whether Mother raised the affirmative defense of absence of willfulness. However, even if we assume, *arguendo*, that Mother preserved the defense, the evidence does not preponderate in favor of a finding that her failure to support the Child was not willful.

It is undisputed that Mother paid no monetary support during the relevant four-month period. Notwithstanding the discussion below regarding Mother's unemployment, Mother testified that she makes some money "doing hair and stuff on the side." When asked how much she makes doing hair, Mother responded, "[I]t [j]ust depends on how—I can't give you an exact amount." As noted above, "That the parent had only the means or ability to make small payments is not a defense to failure to support if no payments were made during the relevant four-month period." Tenn. Code Ann. § 36-1-102(1)(D). Indeed, it appears that Mother had a source of some income—at least enough to support her habits. Mother admitted smoking cigarettes and using cocaine. In this regard, the instant case is similar to **In re Casey C.**, where this Court affirmed the trial court's termination of mother's parental rights on the ground of abandonment by willful failure to support. **In re Casey C.**, No. M2016-01344-COA-R3-PT, 2016 WL 7340429 (Tenn. Ct. App. Dec. 19, 2016), *perm. app. denied* (Tenn. Jan. 25, 2017). In that case, we specifically affirmed the trial court's finding that

> the mother has not taken reasonable steps to have gainful employment, that

she has during her extended period of unemployment abused drugs and has consistently tested positive for cocaine, that despite having provided only token support for her children, she smokes by her admission, some ten cigarettes [per day] and if she had provided support that the cigarettes and her cocaine cost, that would get her out of this problem of having failed to support her children. [Mother] has chosen to indulge her own habits and addiction at the expense of her relationship with her children and at the expense of her children being supported by a parent.

*Id*. at \*6 (quoting the trial court with approval). In affirming the trial court's termination of mother's parental rights on the ground of abandonment by failure to support, the ***Casey C.*** Court noted that, "Mother is able to get money for her cigarette and cocaine habits but is unconcerned with providing any meaningful support for the Children." ***Id.*** at \*7. The same is true here.

As to the trial court's finding that, "There is evidence to show that Mother has provided more than a token of support for the child through the things she provided during her visits," we have some concern that the "things" Mother provided were purchased by the people she brought to the visits and not by Mother herself. For example, Mother was credited with bringing food for the Child. However, Mother testified that Antonio K. purchased these items:

> I sent him [*i.e.*, Antonio K.] to go get [the Child] something to eat from Walgreen's, the little Gerber things she loves. I sent him to go get those, and he brung 'em to me. So [the Child] sucked em down real quick. And I was like, go get her some mo' or whatever, and he went and got her some mo'.

Likewise, at a visit on October 14, 2022, *see* further discussion *infra*, Mother brought four bags of items for the Child, including toys, clothes, diapers, and wipes. However, according to DCS' record of the visit, Mother did not attend alone; she brought two of her sisters. While we cannot say for certain that the Child's aunts contributed to the things Mother brought, DCS' summary of the visit notes that, "[Mother] and the two sisters brought four bags filled with presents," and Mother explained to the DCS worker that her sisters were "the two people who are supporting her."

However, even assuming, *arguendo*, that Mother procured and purchased every item she brought for the Child, we disagree with the trial court's conclusion that these items amount to more than token support. This Court has noted that, "if a parent's ability to provide additional support is limited by factors outside her control, it cannot be determined that her support is merely token." ***In re Jayda J.***, No. M2020-01309-COA-R3-PT, 2021 WL 3076770, \*19 (Tenn. Ct. App. July 21, 2021). Here, Mother has the ability to work and, in fact, may have a moderate income stream from doing hair, but Mother has not sought steady employment, *see* discussion *infra*. In short, Mother's ability to support the

Child is not affected by any "factors outside her control." Rather, Mother chooses not to work. As such, the record reflects a Mother who has failed to provide monetary support for her Child and who has relied largely on others to provide small items that constitute only token support. Accordingly, we conclude that the record does not support the trial court's conclusion that DCS failed to meet its burden of proof on the ground of abandonment by failure to support. The record clearly and convincingly supports the opposite conclusion. Mother abandoned this Child by failure to provide no more than token support.

## B. Substantial Non-Compliance with the Requirements of the Permanency Plan

Tennessee Code Annotated § 36-1-113(g)(2) provides an additional ground for termination of parental rights where "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4[.]" The Tennessee Supreme Court has explained that:

> Substantial noncompliance is a question of law which we review de novo with no presumption of correctness. Substantial noncompliance is not defined in the termination statute. The statute is clear, however, that noncompliance is not enough to justify termination of parental rights; the noncompliance must be substantial. Black's Law Dictionary defines "substantial" as "[o]f real worth and importance." Black's Law Dictionary 1428 (6th ed.1990). In the context of the requirements of a permanency plan, the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement. Terms which are not reasonable and related are irrelevant, and substantial noncompliance with such terms is irrelevant.

*In re Valentine*, 79 S.W.3d 539, 549 (Tenn. 2002); *In re Carrington H.*, 483 S.W.3d at 537 ("A parent's rights may be terminated for her substantial noncompliance with the responsibilities contained in a permanency plan . . . so long as the plan requirements are reasonable and related to remedying the conditions which necessitate[d] foster care placement.") (citations and internal quotation marks omitted). As explained by the Tennessee Supreme Court:

> Terminating parental rights based on Tenn. Code Ann. § 36-1-113(g)(2) requires more proof than that a parent has not complied with every jot and tittle of the permanency plan. To succeed under Tenn. Code Ann. § 36-1-113(g)(2), the Department must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, *In re Valentine*, 79 S.W.3d at 547; In re L.J.C., 124 S.W.3d 609, 621 (Tenn.Ct.App.2003), and second that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the

- 10 -

particular requirement that has not been met. *In re Valentine*, 79 S.W.3d at 548-49; *In re Z.J.S.* [*and M.J.P.*, No. M2002-02235-COA-R3-JV,] 2003 WL 21266854, at *12 [(Tenn. Ct. App. June 3, 2003)]. Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance. *In re Valentine*, 79 S.W.3d at 548; *Department of Children's Servs. v. C.L.*, No. M2001-02729-COA-R3-JV, 2003 WL 22037399, at *18 (Tenn. Ct. App. Aug. 29, 2003) (No Tenn. R. App. P. 11 application filed).

*In re M.J.B.*, 140 S.W.3d 643, 656-57 (Tenn. Ct. App. 2004).

As noted above, under the permanency plan, Mother had the following responsibilities: (1) complete a parenting assessment, a mental health assessment, and an alcohol and drug (A&D) assessment and follow all recommendations thereof; (2) submit to random drug screens; (3) maintain a legal source of employment and provide proof to DCS; (4) maintain safe and stable housing and provide proof to DCS; (5) maintain contact with DCS and notify DCS of any changes of contact information; (6) refrain from any legal trouble; and (7) comply with four hours of supervised visits each month and notify DCS if unable to attend a visit.

In its final order, the trial court held:

Mother has complied with various requirements of the permanency plan during the seven-month period between the time of the ratification of the first plan and the filing of the termination of parental rights petition. Mother did a mental health assessment, drug and alcohol assessment, and parenting assessment. Mother resolved the legal charges she had which stemmed from the initial incident which caused the child to be placed in DCS custody. She did not incur any new charges. Although it was after the petition to terminate her rights was filed, Mother did eventually find stable housing. Mother did find employment throughout the time the child was in custody; however, it was not steady employment. Furthermore, she has visited the child regularly throughout the child's time in DCS custody. As mentioned previously, she did support the child through the material items she provided during her visits. There is not proof that Mother is in substantial noncompliance with the permanency plan.

The record does not support the trial court's conclusion.

**Assessments and Recommendations**

Turning to Mother's requirements under the parenting plan, it is undisputed that

Mother completed the parenting,[3] mental health, and A&D assessments. However, Mother also was required to comply with the recommendations of those assessments. Although the trial court found that, "Mother did a mental health assessment, drug and alcohol assessment, and parenting assessment," the order is silent as to whether Mother followed the recommendations of these assessments. From our review, she did not.

The recommendation from the A&D assessment was that Mother attend NA and AA meetings. Importantly, the A&D recommendation was not for intensive outpatient treatment ("IOS"), or in-patient treatment. Nonetheless, throughout these proceedings, Mother has insisted that DCS provide her with IOS or in-patient referrals. From Mother's testimony, her perceived need for IOS or in-patient was due to the fact that she was "not passing drug screens" and was admitting to illicit drug use. However, there is no professional recommendation for intensive treatment. Belinda Pelicci, one of the DCS FSWs, testified:

> Q. The recommendations of that [A&D] assessment were NA and AA?
> A. Correct.
> Q. Okay. Has Mom done that?
> A. Not to my knowledge.

Although IOS was not recommended under the A&D assessment, and DCS had no obligation to provide the service, DCS nonetheless obtained approval for Mother to attend an online IOS program. Mother complained and quit. Still insisting, without any professional recommendation, that she needed IOS, Mother checked herself into an in-patient facility. However, Mother left after one week. In her testimony, Mother stated that the facility was a "ghetto," where she was left by herself in a room and given unprescribed medication for "anxiety."

We include these facts concerning IOS to make the point that Mother's only requirement under the A&D assessment was to attend NA and AA meetings. Mother's testimony indicates that she was aware that the A&D recommendation was for meetings, to-wit:

> Q. And on the alcohol and drug assessment, was it your understanding that you—or what was your understanding of what the original assessment said that you needed to do?
> A. Just take like AA classes or something like that, I think.

***

---

[3] The recommendation from the parenting assessment was for Mother to submit to mental health and A&D assessments.

Q. Okay. So as part of the A&D assessment, initially you were just required to do AA and NA classes. Is that your recollection?
A. Yes, ma'am. I think so.

A collection of DCS' case recording summaries was admitted as trial exhibit 17. According to the summary dated November 16, 2022, "FSW asked [Mother] if she has been going to AA/NA. [Mother] said she was not aware that was something she needed to do. FSW texted [Mother] a link to [] classes that she can look into. [Mother] told FSW that she is going to have to quit her job to do [] classes, FSW told [Mother] that is not true, and that [she] can find classes around her schedule." As discussed above, there is no evidence that Mother was working during this time. The required NA and AA meetings are free and readily available. If Mother simply had attended these meetings, she would have satisfied the A&D recommendation and would have been in compliance with this requirement of the permanency plan. However, there is no indication that Mother attended even one meeting. Rather, she continued to insist on IOS (although she failed to follow through with that treatment) and, in so doing, failed to comply with the recommendation that she simply attend meetings. Mother used her self-prescribed need for IOS to excuse her failure to address her drug addiction at all. Mother testified that she needed health insurance to attend IOS, but she refused to get a job that would provide insurance. When questioned as to why that is, the following testimony ensued:

Q. All right. And you said you don't have insurance because you—well, we talked about getting a job that offers insurance, but you—
A. But yet, still if I was to get one, y'all supposed to pay for it [*i.e.,* IOS treatment], so why would I go out of my way when I don't have to? No, I'm not saying that I'm not getting a job, because I'm actually working on that now. I'm saying even if I get a job that offers insurance, it's [*i.e.* we assume deductibles and co-pays] still going to have to come out of my pocket. So if y'all 'posed to pay for it, why would [I] do that? I'm not stupid. I'm going to take the free help—why wouldn't I—that you guys are supposed to provide?

For the reasons discussed above, contrary to Mother's testimony, DCS was not obligated to provide IOS services under the A&D recommendation. However, by insisting on IOS, and then relying on her lack of insurance (this due to her own failure to obtain employment), Mother attempts to excuse both her failure to engage in IOS and her failure to avail herself of AA and NA meetings, which would have provided the "free help," to which she asserted she was entitled.

Turning to the mental health assessment, the recommendation was that Mother submit to a full psychological evaluation. The need for a psychological evaluation is evident from the record. Mother testified that she was diagnosed with bi-polar disorder when she was a teenager. Mother stated that she was prescribed medication but chose to stop taking it when she was 18. Mother has not received medical treatment for her mental

condition since that time. Rather, Mother testified that she uses cocaine to alleviate the symptoms of bi-polar and, in this way, justifies her drug use: "My drug problem? I mean, y'all saying that I have a mental health problem, so clearly I'm using the drugs to cope with whatever I'm going through." Although later in her testimony Mother insisted that she was ready to address her mental health issues, she blamed DCS for its alleged failure to facilitate her psychological evaluation. The record does not support Mother's contention.

DCS scheduled Mother for a psychological evaluation in April 2023. Shannon Manor, a Certified Psychological Assistant, who was to conduct the evaluation, testified that she reached out to Mother personally to confirm their appointment for April 26, 2023, by Zoom. Ms. Manor testified that, on the day of the meeting, she sent Mother an email link to join the meeting, but Mother did not respond. Ms. Manor re-sent the link the next day, April 27, 2023, and Mother joined the Zoom meeting approximately 45 minutes late. Because Mother joined late, and Ms. Manor had to leave to pick up her child, Ms. Manor and Mother agreed to resume the evaluation on May 1, 2023. Mother did not join the May 1 meeting. Indeed, Mother testified that, after the truncated meeting on April 27, she did not attempt to contact Ms. Manor to finish the evaluation until June 19, 2023. By that time, the authorization had expired, and Mother never completed the evaluation. Although Mother attempts to blame DCS for this shortcoming, the record clearly shows that the fault lies with her. As discussed above, Mother failed to join the meeting with Ms. Manor on the initial date it was scheduled. Ms. Manor reached out to Mother the next day, and Mother finally joined the meeting forty-five minutes late. Due to Mother's tardiness, Ms. Manor could not complete the evaluation, which was rescheduled to May 1. Ms. Manor sent the link for the re-scheduled meeting to Mother; she failed to join and did not contact Ms. Manor again until more than six weeks later. In short, Mother did not comply with the mental-health assessment requirement of the permanency plan.

**Drug Screens**

Under the permanency plan, Mother was required to submit to random drug screens. Trial exhibits 7 and 8 are comprised of nine "Drug Screen Consent/Refusal and Results" forms. These exhibits show that DCS requested drugs screens from Mother on: (1) May 8, 2022; (2) September 27, 2022, (3) November 15, 2022; (4) February 14, 2023; (5) March 16, 2023; (6) April 25, 2023; (7) December 5, 2023; (8) January 12, 2024; and (9) January 24, 2024. Of these nine requests, Mother refused five. Although, as discussed further *infra*, every time Mother refused to be screened, she did admit to using illicit drugs. However, under this ground for termination, it is her refusal of the majority of DCS's requests for drug screens that results in her substantial non-compliance with this requirement of the permanency plan.

**Employment**

Under the permanency plan, Mother was required to obtain a "legal source of

employment and provide proof to DCS." Mother failed to do so. We begin by reiterating that there is no evidence to suggest that Mother is unable to work. Indeed, Mother testified that, in 2022, she worked for four months as a cashier at 7-Eleven:

Q [to Mother]. Have you had a consistent job the entire time [the Child] has been in custody?
A. No, but I did have a job. I worked at 7-Eleven. I did have a job.[4]
Q. How long did you work there?
A. Oh, about four months, and then—never mind. Just keep going.
Q. Is that the longest you've had a job since [the Child] has been in foster care?
A. Uh-huh, yeah. I mean . . .
Q. When did you have that job?
A. 2022. . . .  I'm going to get a job. I could get a job. I can go back to the job I was working at—
Q. Why don't you have [a job] today?
A. Why don't I have one today? Because I just explained that to you, ma'am. But I can get a job like that—okay, so what are you getting at?
Q. I mean, you're saying court and visitation have kept you from maintaining regular employment—
A. Okay. Yeah.
Q. Is that what you're saying?
A. Yeah.
Q. So how will raising a two—, almost three-year-old, I mean, that would add a whole [other] layer of responsibility (Talking over each other.)
A. I can get a job. I can get a job. I can get a job.

Mother has many excuses for not seeking gainful employment. She asserts that court appearances and visitation requirements preclude employment. Mother further claims that general embarrassment over her criminal charges and these termination proceedings has made her shy to employment:

Q [to Mother]. Are you planning to obtain employment?
A. Yes, ma'am. I'm going to get on that—I'm just going to have to let [7-

---

[4] Mother's testimony that she was employed at 7-Eleven is disputed. Ms. Pelicci testified that:

Q [to Ms. Pelicci]. Legal source of income, was that something Mother had completed at the time of the filing of the TPR?
A. No. And part of the 7-Eleven – [we] did call the location, and [Mother] did not work there.
Q. Okay. But we never have gotten any documentation that she's worked anywhere?
A. No.

Eleven] know; because it's something I have to do. But I am not going to lie. I might—I'm kind of shy sometimes. You might not think that, but I can be. So I just need to be honest, because some places, they don't understand what you want to—if you're trying to better yourself, they'll help you. I don't have to let them know what exactly for maybe—you know. Just like I got court, but when you say court, I don't want them to think I've got a criminal case. You know what I'm saying? So—

Q. Is it your testimony that the only or the reason that you haven't gotten a job at this point is just the embarrassment over what's going on and having to explain that to an employer and ask for time off—

A. Yes.

Q. —for visits and court and—

A. Yes. It's kind of—and which I shouldn't be embarrassed. But, I mean, it is embarrassing. Like that's just the bottom line. But, yes, because I'm going to need that time off.

As discussed further *infra*, Mother also testified that, if she procured employment and insurance, then DCS would be relieved of paying for services it allegedly was "supposed to help" her with:

Q [to Mother]. Why don't you get a job and get insurance?

A. Get a job and get insurance—I will. But, I mean, if y'all—don't try to do that, because if it's in the permanency plan, y'all supposed to help me with it, period. Like, even if I get a job, I still want y'all to pay for it, because that's what y'all 'posed to do.

Mother's excuses are unpersuasive. First, if Mother was embarrassed to seek employment because of her pending legal issues, she had ample opportunity to clear those issues. Recall that at the time the Child was removed from Mother's custody (*i.e.* May 2022), she had an outstanding warrant. The criminal matter remained pending until May 2023, well after DCS filed its petition. Clearly, there was no urgency on Mother's part to resolve her criminal charges. Second, Mother's court and visitation requirements were not so prolific as to preclude all employment. Finally, Mother's statement that she chooses unemployment because she "still wants [DCS] to pay," does not require rebuttal.

At various points in her testimony, Mother stated: "I'm going to get a job"; "I could get a job"; "I can go back to the job I was working at"; and "I can get a job like that." The requirement of the permanency plan was that Mother do so. Despite her own admission that she can get a job whenever she wants, Mother has chosen to do nothing toward this goal. Mother's excuses for her lack of employment are unavailing; she has wholly failed to comply with this requirement of the permanency plan.

**Housing**

As to the requirement that Mother "maintain safe and stable housing and provide proof to DCS," at the hearing, Mother testified that she obtained housing (but not until July 2023, approximately six months after DCS filed its petition). Mother has never produced a lease. More troubling is the testimony of Ms. Pelicci regarding her attempt to perform a home visit just one week before the hearing on the petition to terminate Mother's parental rights:

> Q [to Ms. Pelicci]: . . . [J]ust this week did you make an attempt to go give a drug screen to [Mother] and to see her home?
> A. Yes. I did a pop-up visit on Monday. I had an hour in between court hearings, and I brought one of my workers with me. I knocked three or four times. I could hear someone inside. I don't know if they were talking to someone else. And then [Mother] asked who it was. I said my name, and then she answered the door, asked what I was there for. I said a drug screen and to check out the home. She closed the door, came back out—or opened the door, said that she needed to have a legal consult—or legal advice, that she wasn't refusing the drug screen, but she needed to talk to her attorney before she completed it. And I explained, this is a pop-up visit; this is how drug screens work. She closed the door. My worker and I waited outside for another two to three minutes, but we could hear her on the phone yelling at someone, and then we just left.

Mother's refusal to allow DCS to conduct a home inspection is not the action of a parent who has nothing to hide, and it raises more questions than answers concerning the appropriateness of her housing. Under the permanency plan, Mother was not only required to obtain stable and safe housing, but she was also required to show proof of this to DCS. In the absence of a lease or a home inspection, the only evidence of Mother's housing is her own testimony. In view of Mother's history of transience, drug use, and domestic violence, her testimony is not sufficient proof of a safe and stable home. Accordingly, Mother failed to comply with this requirement of the permanency plan.

### Visitation

Concerning visitation, the trial court found that Mother "has visited the [C]hild regularly throughout the [C]hild's time in DCS custody." Although the record shows that Mother has engaged in visitation throughout these proceedings, it also shows that Mother's visitation was suspended twice and never progressed to unsupervised visits. Under the parenting plan, Mother was required to "comply" with visitation. Therapeutic visits are meant to provide an opportunity for the parent and child to bond and for the parent to demonstrate proper parenting practices. From our review, Mother's actions during some of her visits showed anything but compliance.

From the record, and DCS' case recording summaries, it appears that the first visit

took place around May 31, 2022, shortly after the Child was removed from Mother's custody. As noted in the summary for that visit:

> The parent/child visit took place at DCS. Mom did not have her I.D. so the visit took place outside. Youth was happy to see mom. Mom fed the youth fries that FSW Glenn brought the youth. The visit took place for a hr. There was a man that also accompanied mom, her boyfriend. [The Child] recognized his face and smile at him. FSW Glenn had a conversation with mom regarding future visits and drug screens. Mom informed FSW Glenn that she would have her I.D. for the next visit. . . . Mom also disclosed to FSW Glenn that she would test positive for THC, if drug screen. FSW Glenn was unable to drug screen mom due to mom not having an I.D. to enter the DCS building.

As discussed *infra*, Mother largely refused to submit to DCS' requests for drug screens but admitted to using drugs.

As noted in the DCS case recording summary dated June 17, 2022, a visit was conducted on the same day as the hearing on the ratification of the permanency plan. According to DCS' record, Mother behaved as follows:

> The initial permanency plan for [the Child] was scheduled for 06/14/22. FSW Glenn greeted mom outside and inside the courtroom. When mom saw FSW Glenn upstairs she asked could she hold her daughter. FSW Glenn stated absolutely. [Mother] was in a good mood. Once in the court room; FSW Glenn and Attorney Amy Campbell-Pittz went over the permanency plan. [Mother] objected to every responsibility on the permanency plan. [Mother] became upset and asked for a new attorney. . . . Foster mom begin to speak on the update of the youth and how she is having TEIS reevaluate the youth due to concerns of her not being able to properly sit up at 8 months; [Mother] stated shut the fuck up, why she talking why is she here she need to shut up. The court could not hear all what foster mom was saying due to [Mother] yelling and being disruptive; FSW Glenn tried to go speak with mom to calm her down. However, [Mother] continue to [] yell and be disrespectful to the court[]. Magistrate Rigsby informed mom the importance of listening to concerns regarding her child; [Mother] continued to be disrespectful. After the court hearing was over: FSW Glenn conducted a visit in the FCRB room on the first floor of the court room. [Mother] was accompanied by a male: FSW Glenn asked for his name and identification. The man refused to provide identification and stated his name was James. FSW Glenn informed him if he cannot [provide] documentation; unfortunately he will not be able to visit. [Mother] stated to him "just show her you ID". The man stated "no I just won't visit." The man eventually showed FSW Glenn his identification.

The man was identified as Antonio K[.]. FSW Glenn discussed mom behaviors with her in the court room. Mom stated no "fuck her yelling" FSW Glenn informed mom that [the Child] can feel those emotions, mom continued to curse and yell. FSW Glenn stated "[Mother] as a team we are here to help you to reunify with your daughter, but we need your cooperation as well, we are not against you anyway, the team is only trying to provide you with assistance you need to be successful and reunification." Antonio K[.] engaged in the conversation telling [Mother] see just listen they are trying to help. FSW Glenn went over the permanency plan with [Mother] and informed [her] that the department pays for all services. [Mother] stated omg I didn't know that yes I will do everything I need to do to get my baby back. . . . FSW Glenn attempted to drug screen mom. Mom stated will this be used against her. FSW Glenn informed mom that the services that in place can assist with helping her with any substance abuse issues. Mom informed FSW Glenn on her birthday that she used Suboxone that is not prescribed to her; mom refused the drug screen, but signed the paperwork. After mom calmed down; she bonded well with Toni, changed her clothes and diapers, and fed her a bottle. Toni was smiling throughout the visit and happy the entire visit.

Trial Exhibit 9 is an order entered on June 28, 2022. The order states, in relevant part, that the "court has information that Mother's behavior is inappropriate at her visits. Her visits are suspended until Mother completes drug screens and begins some services. Exception is that DCS may [arrange] and Mother may comply with therapeutic visitation services." Thereafter, DCS set up a virtual visit. According to the case recording summary dated September 21, 2022:

At 4:00pm the parent/child visit started with [Mother] and [Child]. During the p/c visit [Mother] kept getting up and leaving the frame of the camera and started smoking a cigarette. 10 minutes into the visit [Mother] told FSW that the p/c visit isn't working for her due to [the Child] not paying attention. [Mother] started cussing at FSW expressing she does not understand why she is starting out with virtual visits. FSW reiterated to her that FSW needs to see consistency with [Mother] showing up. [Mother] asked FSW for her supervisor. FSW texted TL Pelicci number to [Mother]. [Mother] hung up the call at 4:13PM.

On September 27, 2022, Mother attended a visit. According to DCS' records, Mother was 15 minutes late but

was very excited to see [the Child]. [Mother] brought [the Child] appropriate snacks; apple juice, Gerber baby grow puffs and a feeder pacifier. [Mother] played with [the Child] on the swings. [Mother] was trying to clean [the Child's] nose, [the Child] got upset and [Mother] started yelling at her to

stop. [The Child] seemed happy and was laughing the entire visit besides when she was getting her nose cleaned.

At this visit, Mother "admitted she was still doing cocaine. FSW asked when the last time she used cocaine and [Mother] said last Saturday (9/24/22). [Mother] told FSW that she would also test positive for alcohol."

On October 14, 2022, Mother brought her sisters with her to visit the Child, and the visit went very well. DCS' summary notes that, "[Mother] and the two sisters brought four bags filled with presents for [the Child] to FSW car and said goodbye. FSW went through the bags and saw that [Mother] brought [] two bags filled with clothing and the other two bags were filled with appropriate toys, diapers and wipes." However, at the next visit on November 15, 2022, Mother arrived with Antonio K. According to DCS' summary, Mother was upset during the visit and complained about how the Child was dressed and how her hair looked. Mother

told FSW she did cocaine on 11/15 and drank alcohol on 11/13. FSW told [Mother] that she needs to stop doing drugs and it is not doing any good for her. [Mother] started crying during the visit and FSW asked [Mother] what is wrong. [Mother] told FSW that she does not want to talk about it. The visit ended at 5:00 PM.

Another visit was scheduled for December 11, 2022, but Mother did not confirm that visit 24 hours prior. When DCS informed Mother of this fact and told her there would be no visit, Mother told

FSW that it is "bullshit" the visit is canceled. FSW told [Mother] that the visit was never confirmed with FSW 24 hours in advance. [Mother] said, "I never had to confirm before." TL Pelicci attempted to talk to [Mother] explaining that she has to confirm 24 hours in advance. TL attempted to let [Mother] know that the visit can be rescheduled. [Mother] said, "she doesn't give a fuck, I'm done." [Mother] then hung up the phone. [Mother] called FSW back one minute later and told FSW the reason she can never see [the Child] is due to FSW['s] lack of communication. [Mother] continued by telling FSW that "I do not give a fuck anymore; do not contact me. I do not give a fuck about anything anymore." [Mother] then hung up on the phone. FSW received another text message from [Mother] saying, "Give your [supervisor] my number" and "I refuse to further work with you so she better find me a new worker."

Two days later, on December 9, 2022,

FSW Pettit received a phone call from [Mother]. FSW answered and asked

[Mother] how she was doing, and [Mother] said not good. FSW asked [Mother] if she wanted to talk about and [Mother] said no. [Mother] started yelling at FSW saying "you are a bitch and you are now going see my bad side, I have been nice to you and now I am not going to be anymore." FSW told [Mother] that FSW is aware that [Mother] knows the p/c visits are important, but it is time to set time a side to confirm 24 hours in advance with FSW and to take that responsibility for [the Child]. [Mother] told FSW "I do not give a fuck anymore do not even set up a visit anymore because I am not going to do that." [Mother] told FSW that she has a lot of things to do within a day and does not have time to confirm 24 hours in advance. [Mother] told FSW to not contact her anymore, [Mother] stated "I do not give a fuck about any of this anymore." [Mother] hung up the call. FSW then received a text from [Mother] saying, "you need to set up my visit today."

A visit was scheduled for January 19, 2023, which was just after DCS filed its petition to terminate Mother's parental rights on January 13, 2023. From DCS' summary, this visit did not go well:

FSW arrived at the library at 10:45am. FSW received a phone call from [Mother] at 10:51am asking if the location of the visit could be moved, FSW said no. [Mother] told FSW, she will be late to the visit. FSW asked [Mother] what time she will get to the library, [Mother] told FSW she will get there as soon as possible. FSW received a text from [Mother] at 10:53am saying "I'm in my Uber now I'm on my way." [Mother] showed up with an unauthorized guest known as [Antonio K.]. FSW recognized this individual due to him showing up to past visits. FSW told [Mother] the individual needs to leave the visit; he is not authorized to be at visits. [Mother] told FSW she will tell him, but he can give FSW his ID for future visits. FSW told [Mother] FSW will take his ID, but he cannot be at this visit today. The unauthorized guest did not give FSW the ID and left. Safeyah Ashari arrived at the visit to give FSW support. FSW let Safeyah know that an unauthorized was here and the visit will be cancelled if he shows up again. FSW noticed the unauthorized guest came back to the children section of the library with food for [the] baby [], FSW told [Mother] again that he cannot be in this visit or FSW will cancel. [Mother] said to FSW, "well cancel it bitch I don't give a fuck." [Mother] sat back on the floor with [the Child, who] was crying for a majority of the visit. When [the Child] started crying, [Mother] would make [the Child] drink juice to make her stop crying[. The Child] was crying and coughing while drinking the juice. [Mother] called the unauthorized guest telling him to come back up to the children's section and continued to say she will "get rid" of the FSW just like the last FSW. [Mother] went on by saying "fuck her l don't give a fuck if she ends the visit, I'll tell her the fuck off, she's just mad I cussed her out." [The Child] continued to cry while [Mother] was yelling

- 21 -

on the phone, [Mother] started to yell at [the] baby [] telling [her] to "be quiet" or to "hush." FSW noticed the unauthorized individual came back, [Mother] went to go over to the individual and left [the Child] alone in the play area, FSW told [Mother] FSW is going to the cancel the visit due to the individual continuing to come back to the visit. [Mother] told FSW she is just going to get the food he brought. FSW asked [Mother] if she was going to just leave [the Child] alone while [she] went and did that, [Mother] started yelling and cussing at FSW. FSW told [Mother] the visit is over and being cancelled. [Mother] told FSW to call the police or call FSW supervisor because there is no reason the visit should be cancelled. FSW called TL Belinda Pelicci to explain to [Mother] why the visit was being cancelled. [Mother] would not listen to TL due to [Mother] yelling at FSW and TL. TL attempted to explain to [Mother] why this visit was cancelled due to the unauthorized individual. FSW told TL that the unauthorized individual came back for a third time. TL agreed with FSW to go ahead and cancel the visit. At this time security came over to FSW, Safeyah and [Mother]. [Mother] told security to get away from her. The security guard told [Mother] the yelling and cussing needed to stop. [Mother] told security to "get the fuck out of my face." FSW told security FSW is DCS, and we are all trying to leave the library, FSW asked the security guard to escort Safeyah and FSW to FSW['s] car, security said yes. Safeyah was holding [the Child] when [Mother] took [the Child] out of Safeyah's arms, FSW told [Mother] to stop and since the visit is over Safeyah needs to hold [the Child]. Safeyah took [the Child] back. Security escorted [Mother], FSW and Safeyah downstairs. [Mother] continued to yell and cuss at FSW. The security guard warned [Mother] she will be banned from coming into the library for 90 days if [Mother] continues to act this way. [Mother] followed FSW and Safeyah downstairs and still was yelling. Two more security guards came out to help escort off library property. During this [Mother] was yelling at FSW saying "I will fuck you up" and "l will beat your ass" and "fuck you bitch l don't give a fuck." FSW and Safeyah waited for security so FSW and Safeyah could be brought to FSW['s] car. FSW asked security how long [Mother] was banned for and security said a year.

Following this visit, the guardian ad litem filed a motion to suspend Mother's visitation. By *ex parte* order of January 28, 2024, the trial court granted the motion.

From the foregoing, Mother did attend some visits, and she did act appropriately at a few, but her outbursts and confrontations during other visits largely negated any progress that might have been achieved. Mother has an anger problem, and she clearly is unable to control her outbursts, even when the Child is present. During her testimony, Mother acknowledged this fact:

Q [to Mother]. Do you believe that if you were to have some kind of mental health treatment . . . that that could assist you in kind of keeping yourself in check, even if you get upset, having a more appropriate reaction to that?
A. Yes, I honestly do. I honestly do, because I'm—I mean, I'm sure y'all all just seen, I think I'm— I done had, like, little moments today. But I'm trying my best to stay composed, and that's hard for me sometimes, because my anger can get the best of me.

From our review, we conclude that the evidence does not support the trial court's conclusion that DCS failed to meet its burden of proof on the ground of failure to substantially comply with the reasonable requirements of the permanency plan. The evidence clearly and convincingly supports the opposite conclusion—Mother failed to comply with the reasonable requirements of the permanency plan. As such, DCS met its burden to prove this ground.

## C. Persistence of the Conditions that Led to the Child's Removal

Under Tennessee Code Annotated section 36-1-113(g)(3), a parent's rights may be terminated if:

The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

As noted above, Mother stipulated to the facts alleged by DCS in its dependency- and-neglect petition, and the trial court adjudicated the Child dependent and neglected in April 2022 for lack of supervision, unstable housing, and drug exposure.

In its final order, the trial court found:
The Department argues that the conditions of the removal still persist due to

- 23 -

the positive drug tests Mother has taken and Mother admitting to still using drugs. However, this was not the condition that originally brought the child into custody. The child was initially brought into custody because of lack of supervision. There was later a finding of instable housing and drug abuse. At the time of the hearing, Mother had stable housing and acknowledged and understand the seriousness of the lack of supervision which brought the child into custody. Although Mother is admittedly still using illegal drugs, she has attempted to enter treatment. Mother has been combatting her drug use by taking herself to three different inpatient facilities. The Department has not assisted in the treatment of Mother's drug use. Therefore, there is not proof of grounds for termination as to persistent conditions.

The trial court correctly noted that the conditions that led to the Child's removal from Mother's custody were Mother's drug use, unstable housing, and lack of supervision. From our review, these conditions persist.

The trial court found that Mother has "stable housing." The record does not support this finding. As discussed above, although Mother testified that she has leased an apartment, she has not provided a lease. Other than Mother's testimony, there is no proof that she is the lessee or sole occupant of the apartment. More troubling to this Court is Mother's refusal to allow DCS employees to enter the apartment for inspection.

The trial court found that "Mother is still admittedly using drugs." Indeed, during her testimony, Mother candidly stated, "I snort cocaine. . . ." This statement alone is sufficient proof for a finding that Mother's drug use persists. Nonetheless, the trial court credited Mother for "taking herself to three different inpatient facilities." As noted above, Mother quit all of the treatments she started. Thus, her problem with drugs persists. Finally, the trial court appears to ignore Mother's drug screens. As discussed, DCS requested nine drug screens. Of those requested screens, Mother: (1) refused five but admitted to using illicit drugs; (2) tested positive for illicit drugs on three; and (3) tested negative on one. Mother's only negative screen was performed on January 25, 2024, the first day of the hearing on the petition to terminate her parental rights. On January 31, 2024, when trial resumed for the second day, Mother tested positive for cocaine and marijuana. In addition to her continuing drug use, Mother has failed to seek help for her mental health issues, and she has engaged in angry outbursts throughout these proceedings, *see* further *infra*.

Clearly, DCS has met its burden to show that the conditions that led to the Child's removal, *i.e.* drug use, and lack of stable housing persist. Furthermore, we note that Mother's anger issues have not been addressed. These problems persist and prevent the [C]hild's safe return to the care of the parent." Tenn. Code Ann. § 36-1-113(g)(3)(i). Because, to date, Mother has not addressed her drug use, mental health, or anger issues, "[t]here is little likelihood that these conditions will be remedied at an early date so that

- 24 -

the [C]hild can be safely returned to the parent. . . .” Tenn. Code Ann. § 36-1-113(g)(3)(ii). As such, “[t]he continuation of the parent or guardian and child relationship greatly diminishes the [C]hild’s chances of early integration into a safe, stable, and permanent home.” Tenn. Code Ann. § 36-1-113(g)(3)(iii). For these reasons, we reverse the trial court’s denial of DCS’ petition on this ground.

## D. Failure to Manifest an Ability and Willingness to Assume Custody

Tennessee Code Annotated section 36-1-113(g)(14) provides a ground for termination of parental rights where:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

To prove this ground, DCS was required to show that (1) Mother failed to manifest either an ability or willingness to assume custody or financial responsibility for the Child; and (2) returning the Child to Mother’s custody would pose a risk of substantial harm to the Child’s welfare. *See In re Neveah M.*, 614 S.W.3d 659, 674, 677 (Tenn. 2020); *In re Jeremiah S.*, No. W2019-00610-COA-R3-PT, 2020 WL 1951880, at \*6 (Tenn. Ct. App. Apr. 23, 2020) (“Under this ground for termination, the petitioner must prove each element by clear and convincing evidence.”) (citation omitted). As to the first prong, the Tennessee Supreme Court has instructed:

> [S]ection 36-1-113(g)(14) places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child. If a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied.

*In re Neveah M.*, 614 S.W.3d at 677 (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at \*13 (Tenn. Ct. App. June 20, 2018)). Concerning the “substantial harm” requirement of the second prong, this Court has observed:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier “substantial” indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the

harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at \*8 (Tenn. Ct. App. Apr. 4, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted in *Maya R.*)).

Turning to the final order, the trial court made the following findings concerning this ground:

> In this case, Mother has manifested an ability and willingness to assume legal and physical custody of the child. Mother has attempted to follow through with the requirements of the permanency plans with DCS. Mother has done many things on her own, without much assistance by the department, to remedy the conditions that relate to the child remaining in custody. Mother has submitted to a mental health assessment, a drug and alcohol assessment, and a parenting assessment. Mother resolved her legal charges and has not incurred any new charges. Mother has established stable housing. Most importantly, Mother has visited the child regularly throughout the child's time in DCS custody and has a strong bond with the child. As mentioned previously, she did support the child through the material items she provided during her visits.
>
> Unfortunately, Mother has struggled with illegal drug use throughout the time the child has been in DCS custody. Mother has admitted to her struggles and has asked for help. Although Mother has attempted at least three different treatment facilities, she is willing to attempt to try again. Although Mother is still actively using illegal drugs, this does not mean that she is unable to assume legal and physical custody of the child. Mother obviously needs more time and more support in order to maintain sobriety. Therefore, there is not grounds for termination as to Mother's failure to manifest an ability and willingness to assume legal and physical custody of the child.

For many of the reasons previously discussed, the trial court's findings are not supported by the evidence. Mother does not have the ability to assume custody of the Child. By her own admissions and her many failed drug tests, Mother is still actively using cocaine. Nonetheless, as set out in context above, the trial court found that, "Although Mother is still actively using illegal drugs, this does not mean that she is unable to assume legal and physical custody of the child." Respectfully, it does mean that she cannot assume custody. However, if more proof is necessary, the record is replete with reasons why Mother is unable to assume custody of this Child. In addition to her drug use, she is unemployed. Mother's ability to provide a stable and safe home has not been proven. Mother has not

addressed her mental health issues. When asked why she had not, Mother stated, "I'm going to do it," and "I want to do it." Indeed, the trial court stated that Mother "is willing to attempt to try," and noted that she "obviously needs more time and more support." These things may be true, but from our review, Mother has had ample time, opportunity, and help to address the issues that negate her ability to assume custody, but she has not availed herself. There is clear and convincing evidence to prove the first prong of this ground.

As to the second prong of this ground, from our review, there is clear and convincing evidence to show that returning the Child to Mother's custody would pose a risk of substantial harm to the Child. We know that Mother uses cocaine and has unaddressed mental health issues, but this Court is equally troubled by Mother's apparent anger issues. Throughout these proceedings, Mother has cursed and threatened every DCS worker and attorney assigned to her case. Mother also cursed the foster mother in the presence of the trial court, *see* DCS case reporting summary from the hearing on the ratification of the permanency plan *supra*. More troubling is that some of Mother's tirades have been in the Child's presence, and some of her anger has been directed at the Child. As set out in DCS' summaries, *see supra*, at one visit, "[w]hen [the Child] started crying, [Mother] would make [the Child] drink juice to make her stop crying. [The Child] was crying and coughing while drinking the juice." As previously noted, the Child suffers from feeding issues. At one visit, DCS noted that, "[The Child] continued to cry while [Mother] was yelling on the phone, [Mother] started to yell at [the] baby [] telling [her] to 'be quiet' or to 'hush'." At another visit, Mother became upset over a drug test, and "walked up to FSW Glenn and the baby and snatched the baby's shoes off [] her feet, stating, since my visits probably will be canceled, then she can't have the shoes I brought her."

From the foregoing, we conclude that DCS met its burden to show, by clear and convincing evidence, that Mother lacks the ability to assume custody of the Child. In view of Mother's continuing addiction, and her untreated mental health and anger issues, we also conclude that DCS has met its burden to show that returning the Child to Mother's custody would pose a "a real hazard or danger" to the Child's welfare. ***In re Maya R.***, 2018 WL 1629930, at \*8. Because DCS has met its burden of proof, we reverse the trial court's denial of the petition on this ground.

## V. Best Interest

Although the trial court held that DCS failed to prove any of the grounds asserted for termination of Mother's parental rights, it engaged in a best-interest analysis. This was unnecessary; however, in view of our holding that grounds for termination of Mother's parental rights exist, we will conduct a review of the trial court's best interest analysis to determine whether termination is warranted in this case.

Tennessee Code Annotated section 36-1-113(i)(1) contains a non-exclusive list of factors applicable to the court's best-interests analysis. The statute provides:

(i)(1) In determining whether termination of parental or guardianship rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court.

At the time of the filing of the petition to terminate Mother's parental rights, those factors included, but were not limited to, the following:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol,

controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

The statutory factors are not exclusive but "illustrative . . . and any party to the termination proceeding is free to offer any other factor relevant to the best[-]interests analysis." ***In re***

- 29 -

***Gabriella D.***, 531 S.W.3d 662, 681 (Tenn. 2017) (citation omitted). Whether termination is in the child's best interest must be "'viewed from the child's, rather than the parent's, perspective.'" ***Id.*** (quoting ***In re Audrey S.***, 182 S.W.3d at 878). "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child[.]" ***Id.*** (quoting Tenn. Code Ann. § 36-1-101(d) (2017)). The court's "'focus on the perspective of the child is the common theme' evident in all of the statutory factors." ***In re Neveah M.***, 614 S.W.3d 659, 679 (Tenn. 2020) (quoting ***In re Audrey S.***, 182 S.W.3d at 878).

The trial court's factual findings relevant to the best-interest analysis must be supported by a preponderance of the evidence. ***In re Kaliyah S.***, 455 S.W.3d at 555 (citation omitted). Additionally, the court must determine whether the combined weight of the facts amounts to clear and convincing evidence that termination of parental rights is in the child's best interest. ***Id.*** (citation omitted). As noted above, we review the trial court's best-interest analysis under the standard of review applicable to mixed questions of fact and law. ***In re Taylor B.W.***, 397 S.W.3d at 112-113. We will affirm the trial court's factual findings unless they are unsupported by a preponderance of the evidence. ***In re Neveah M.***, 614 S.W.3d at 674 (citations omitted). Whether the court's factual findings amount to clear and convincing evidence that termination of parental rights is in the child's best interest is a question of law that we review *de novo* with no presumption of correctness. ***Id.*** (citations omitted).

Turning to the final order, the trial court considered the relevant statutory factors and made the following findings:

> **(1) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority.**
> In this case, the [C]hild has been in the same foster home since May of 2022. She has bonded with the foster parent and has stability. It is in the [C]hild's best interest to remain in the foster home until Mother has completed the requirements set forth in the permanency plan.
> **(2) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition.**
> A change of caretaker and physical environment is not likely to have a negative effect on the [C]hild's emotional, psychological, and/or medical condition. Mother has visited with the [C]hild and created an emotional bond with the child. The [C]hild knows Mother and has been around her throughout her life. Although the [C]hild has special medical needs, Mother has the capability of learning how to properly care for her. During her visits, Mother has been appropriate in her care for the [C]hild.
> **(3) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety**

**needs.**

Mother has made efforts, on her own, to create stability for herself and the child. She has attended various assessments to learn to provide the best for her [C]hild. She has obtained stable housing and can provide for the C]hild.

**(4) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment.**

Mother and [C]hild have created a bond through their regular visitation. Their visits show that there is a secure and healthy parental attachment.

**(5) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child.**

Mother has maintained regular visits with the [C]hild to cultivate a positive relationship. She has bonded with the [C]hild and has made an effort to create a positive, loving relationship.

**(6) Whether the child is fearful in living in the parent's home.**

The [C]hild has bonded with her Mother and is not fearful of the Mother. There has not been an opportunity for the [C]hild to be in Mother's home.

**(7) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms.**

There is no evidence that anything or anyone in Mother's home will trigger or exacerbate the [C]hild's experience of trauma or post-traumatic symptoms.

**(8) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent.**

The [C]hild has created a healthy parental attachment with her foster mom. She has been in her care for almost three (3) years now. However, she has clearly bonded with her mother and loves her as well. Foster mom wants the [C]hild to have a relationship with her Mother and is willing to help with establishing and nurturing the relationship.

**(9) Whether the child has emotionally significant relationships with persons other than parents and caregiver, including biological or foster siblings, and the likely impact of various available outcomes on the relationships and the child's access to information about the child's heritage**.

The [C]hild has bonded with her foster siblings while in the care of her foster mom.

**(10) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the**

**use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner.**

Mother has completed many assessments, without much support of the Department, to create a lasting adjustment of circumstances to make it safe and beneficial for the child. She has recently secured stable housing and maintained that housing. Mother has an issue with substance abuse but has not received any assistance from the Department. Mother testified that she needs help and has sent herself to multiple in-patient facilities, yet the Department has not assisted her in getting further treatment.

**(11) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct or conditions.**

Mother has taken advantage of some of the programs and services offered. Most importantly, Mother has attempted drug treatment services which she found on her own without the help of the Department. She admitted herself into different programs to obtain treatment. Although the Department did pay for her parenting assessment and her psychological assessment, they have not put in much effort to assist Mother to follow through on the recommendations from the assessments on the parenting plan.

**(12) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department.**

The Department has not made reasonable efforts to assist Mother in making a lasting adjustment. The Department filed for the suspension of Mother's visits because she cussed out a worker for having a disagreement. Beyond paying for assessments and conducting random drug screens, the Department did little else in assisting Mother to reunite with her [C]hild.

**(13) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest.**

Mother has demonstrated a sense of urgency in seeking custody for the child and addressing the circumstances that made the award of custody unsafe. The child entered custody for an allegation of lack of supervision. Mother has completed parenting assessments to address the circumstances that caused the child to enter custody. Mother has continued to visit and bond with the child. Mother is willing to continue with treatment and follow through with any recommendations in order to regain custody of the [C]hild.

**(14) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;**

No one resides with Mother who has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any child.

**(15) Whether the parent has ever provided safe and stable care for the child or any other child;**

Mother has a total of four children. One child was born while Mother herself was in DCS custody at 16 years old. That child was adopted. Another child lives with his father because Mother did not have a stable home at the time. Mother's third child was originally placed in the custody of the maternal grandmother through the Department due to Mother's illegal drug use. The child was then placed with the maternal aunt when the grandmother passed away.

**(16) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;**

Mother has demonstrated an understanding for the basic needs for the [C]hild to thrive by completing parenting assessments and obtaining stable housing. She additionally testified she is taking the [C]hild's needs seriously and wants to take all proper means necessary to change.

**(17) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;**

Mother has maintained stable housing since July of 2023. Although Mother is still struggling with her illegal drug use, she has demonstrated the ability and testified to the commitment to create and maintain a home that meets the [C]hild's basic and specific needs.

**(18) Whether the physical environment of the parent's home is healthy and safe for the child;**

Mother testified that she has stable housing that is healthy and safe for the [C]hild.

**(19) Whether the parent has consistently provided more than a token of financial support for the child; and**

Mother has provided clothes, toys, and food for the [C]hild during her visits. While there is no court ordered child support, Mother has provided other needs for the child.

**(20) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.**

Mother has admitted herself into multiple facilities to receive treatment. She has done so on her own and completed many of the requirements from the parenting plan. She has shown that she is trying and has the mental and emotional fitness to help herself and her daughter.

For many of the reasons previously discussed, we conclude that the record does not support the trial court's conclusion that termination of Mother's parental rights is not in the Child's

best interest.

As set out above, one of the best interest factors requires the trial court to consider "[w]hether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department." Tenn. Code Ann. § 36-1-113(i)(1)(L). Accordingly, we first review the trial court's conclusion that DCS failed to make reasonable efforts in this case.

> In *In re Kaliyah S.*, the Tennessee Supreme Court held that
> the extent of DCS's efforts to reunify the family is weighed in the court's best-interest analysis, but proof of reasonable efforts is not a precondition to termination of the parental rights of the respondent parent. As with other factual findings made in connection with the best-interest analysis, reasonable efforts must be proven by a preponderance of the evidence, not by clear and convincing evidence. After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest.

*In re Kaliyah S.*, 455 S.W.3d 533, 556 (Tenn. 2015) (citations omitted). As set out in context above, the trial court found: (1) "Mother has attempted drug treatment services which she found on her own **without the help of the Department**"; (2) "Mother has an issue with substance abuse **but has not received any assistance from the Department**"; (3) "Mother testified that she needs help and has sent herself to multiple in-patient facilities, **yet the Department has not assisted her in getting further treatment**." (Emphases added). We have previously noted the fact that Mother's A&D assessment recommended only AA and NA meetings. There has never been a recommendation for any other form of treatment. Accordingly, DCS was not obligated to assist Mother in entering inpatient or outpatient treatment for her addiction. DCS provided Mother with a list of local AA & NA meetings, and she chose not to attend. Nonetheless, DCS did help Mother procure online IOS treatment, but she did not follow through. DCS provided Mother with therapeutic visits, which she often disrupted with angry outbursts. DCS provided Mother with assessments; Mother failed to follow through with the mental health assessment. DCS provided Mother with drug screens, the majority of which she refused or otherwise failed. From the totality of the circumstances, we conclude that DCS made reasonable efforts to assist Mother during these proceedings, but Mother failed to avail herself of these opportunities. As such, the evidence does not support the trial court's finding that, "Mother has taken advantage of some of the programs and services offered," and this best interest factor weighs in favor of termination of Mother's parental rights. Tenn. Code Ann. § 36-1-113(i)(1)K).

Turning to the best-interest factors concerning a parent's ability to provide a safe and stable home for the child, the trial court found that Mother has shown the ability to do

so. We have previously discussed the fact that Mother provided no lease and denied DCS access for a home inspection. Furthermore, Mother is still using drugs, her mental health issues have not been addressed, she lashes out in anger (in front of the Child and sometimes toward the Child), and she is still associating with Antonio K. Recall that Mother made her best effort toward drug rehabilitation at Next Door. However, she relapsed when Antonio K. was released from jail, and they resumed their relationship. During her testimony, Mother admitted that Antonio K. gave her drugs:

Q. Did Antonio used to provide you with drugs?
A. Yes.

When asked how she procures drugs when Antonio K. is in jail, Mother testified:

A. I mean, I go around someone. Maybe they've got it, and I might do some of theirs, but whatever. I wouldn't say—I don't know. I don't just call somebody up and say, hey, can you bring me—I just might go around somebody. . . . I said I might go around somebody that's already doing it and got it or whatever, but --
Q. And they just give you cocaine because they like you?
A. They might be doing it theirself [sic]. I don't know.
Q. So why would they give you their drugs?
A. 'cause it's just drugs. People don't care, like, about stuff like that. And I go around them because I know they've got it if I want to do some, yes.

Clearly Mother has a network of illicit drug users around her. This does not bode well for stability and safety in her household. The foregoing undisputed facts do not support the trial court's findings regarding best-interest factors (C), (F), (J), (O), (P), (Q), (R), and (T). These factors clearly weigh in favor of termination of Mother's parental rights.

Furthermore, the record does not support the trial court's finding that Mother has a bond with the Child. The trial court notes that the Child "is not fearful of the Mother," but that fact alone does not support the trial court's finding. From our review, this Child is bonded with her foster mother and the other children in that household. She calls her foster mother, "Mom." She views the other children as her siblings. In short, the record does not support the trial court's findings concerning best interest factors (D), (H), and (I). Rather, these factors clearly weigh in favor of termination of Mother's parental rights.

We have previously discussed the fact that, although Mother attempted therapeutic visits, she often left these visits in a rage, with the Child and everyone else upset in her wake. So, while these visits could have helped with the parent/child bond, Mother's behavior and lack of cooperation largely negated any benefit of those visits. Because Mother has failed to "used the visitation or other contact to cultivate a positive relationship with the child," contrary to the trial court's finding, best-interest factor (E) weighs in favor

of termination of Mother's parental rights. Furthermore, in view of our holding that the evidence does not support the trial court's conclusion that Mother provided more than token support for the Child, best-interest factor (S) also weighs in favor of termination of Mother's parental rights.

The Child has serious issues with feeding. She is prone to choking and must be supervised while eating. The Child also has weakness in her legs that curtails her ability to stand. The foster mother testified that the Child is attending therapy for these issues. Consistency is paramount in overcoming these challenges. The Child would likely suffer if she was removed from her foster family. Contrary to the trial court's findings, best-interest factors (A) and (B) weigh in favor of termination of Mother's parental rights.

From the totality of the circumstances, we conclude that DCS has met its burden of proof to show, by clear and convincing evidence, that termination of Mother's parental rights is in the Child's best interest.

## VI. Conclusion

For the foregoing reasons, we reverse the trial court's order. The case is remanded for entry of an order terminating Mother/Appellee's parental rights, and for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed to the Appellee, Teai S. Because Teai S. is proceeding *in forma pauperis* in this appeal, execution for costs may issue if necessary.

s/ Kenny Armstrong
KENNY ARMSTRONG, JUDGE
